# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

| | |
|---|---|
| **KEVIN L. STEELE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.  ) | **CIVIL ACTION NO. 5:07-00703** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on Plaintiff's Motion for Summary Judgment (Document No. 12.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 14.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 7 and 8.)

The Plaintiff, Kevin L. Steele (hereinafter referred to as "Claimant"), filed an application for SSI on March 29, 2004 (protective filing date), alleging disability as of January 1, 2004, due to nerves; arthritis pain throughout his body; pain in his hips, knees, spine, neck, and legs; a hiatal hernia; bad migraines; and vision problems in the right eye. (Tr. at 46, 47-49, 58-59.) The claim was denied initially and upon reconsideration. (Tr. at 23-25, 30-32.) On June 6, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 35.) The hearing was held on March 15, 2006, before the Honorable Lawrence E. Shearer. (Tr. at 390-425.) By decision dated May 22, 2006, the ALJ determined that Claimant partially was entitled to benefits. (Tr. at 15-20.) The ALJ's decision became the final decision of the Commissioner on August 30, 2007, when the Appeals

Council denied Claimant's request for review. (Tr. at 4-6.) On November 5, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since January 1, 2004, his alleged onset date. (Tr. at 19, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative arthritis of the left hip, degenerative joint disease of the lumbosacral spine, left knee dysfunction secondary to tear of the anterior cruciate ligament, diminished vision in the right eye, depression, and anxiety, which were severe impairments. (Tr. at 19, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 3.) The ALJ then found that from January 1, 2004, through July 16, 2005, Claimant had a residual functional capacity for work at the sedentary level of exertion that involved "only simple, one-to-three step tasks, does not require climbing ladders, ropes or scaffolds, and does not involve concentrated exposure to fumes, odors, dust, gases, or hazards." (Tr. at 19, Finding No. 5.) At all times subsequent to July 17, 2005, the ALJ found that Claimant was unable to perform any substantial gainful activity on a regular and continuing basis. (Tr. at 19-20, Finding No. 5.) At step four, the ALJ found that Claimant had no relevant work history. (Tr. at 20, Finding No. 8.) Based on Claimant's vocational profile residual functional capacity through July 16, 2005, and on the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could have performed jobs such as a general office worker, sales worker, security monitor, receptionist, and information clerk. (Tr. at 20, Finding No. 9.) On this basis, benefits were denied prior to July 17, 2005. (Tr. at 20, Finding No.

3

11.) Considering Claimant's limitations since July 17, 2005, the ALJ concluded that there were no jobs existing in significant numbers which Claimant could perform and found that Claimant had been under a disability since July 17, 2005. (Tr. at 20, Finding Nos. 10 and 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on February 14, 1978, and was 28 years old at the time of the administrative hearing, March 15, 2006. (Tr. at 15, 47, 397.) Claimant had an eleventh grade education and no vocational training. (Tr. at 15, 62, 399.) Claimant had no relevant work history. (Tr. at 15, 59-60, 419.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ arbitrarily established Claimant's onset of disability as July 17, 2005. (Document No. 13 at 4-6.) Specifically, Claimant contends that the ALJ "erred in arbitrarily crediting the claimant's testimony for periods after July 17, 2005 and discrediting the same claimant's testimony prior to that date." (Id. at 4.) He further contends that the ALJ erred in "requiring the claimant to demonstrate that he was incapable of any activities at all times." (Id.) Claimant asserts:

> The claimant's testimony regarding his symptoms as well as the findings of the physician who actually examined him have been consistent from the claimant's date of onset through the date of the hearing. Claimant submits that there is nothing in the record of the claim to support the ALJ's contention that the claimant suddenly became credible on July 17, 2005. Similarly, there is no support for the ALJ's determination to place "great weight" on the contention of the consulting physician for the defendant made on April 27, 2005. The consultant offered no explanation whatsoever for his contentions regarding the claimant's functional capacity. The symptoms relied upon by the consulting physician was said by him to show that the claimant's "pain allegation is only partially credible" and that his limitations on his activities of daily living were not "completely supported by medical evidence" (record page 251). These allegations are contradicted not only by the physician who actually evaluated the plaintiff but by the ALJ's own determination that the plaintiff was disabled at least as of July 17, 2005 despite the fact there was absolutely no intervening change in the plaintiff's overall condition.

(Id. at 5-6.)

The Commissioner asserts that in finding Claimant not disabled prior to July 17, 2005, the ALJ properly relied on the assessment of Dr. Reddy that Claimant could perform sedentary work, and the unremarkable clinical findings of Dr. Rago in September, 2004; the January, 2005, emergency room notes; and of Dr. Chand in May, 2005. (Document No. 14 at 8.) The Commissioner

5

further asserts that the ALJ properly noted that in May, 2005, x-rays revealed only "early" arthritic changes. (Id.) The Commissioner asserts that the Claimant "relies solely on conclusory allegations to challenge the onset date of disability of July 17, 2005," but failed to cite any medical evidence to support his arguments. (Id. at 8-9.) Despite Claimant's allegation that the ALJ arbitrarily selected the onset date, the Commissioner contends that the ALJ "examined the medical evidence and found much more significant laboratory results and clinical findings as of July 17, 2005." (Id. at 9.)

First, the Commissioner asserts that the ALJ properly relied on Dr. Reddy's April, 2005, opinion that Claimant was able to perform medium exertional level work and gave Claimant the benefit of the doubt and reduced his functional capacity to sedentary work. (Id.) Second, the Commissioner asserts that the ALJ properly noted that Claimant's left hip pain progressively worsened on July 17, 2005, and thereafter. (Id.) X-rays prior to July 17, 2005, revealed only early osteoarthritis, whereas x-rays after July 17, 2005, revealed subsequent development of osteoarthritis. (Id. at 9-10.) Physical examinations prior to July 17, 2005, generally were unremarkable, where as after July 17, 2005, Dr. Morgan stated that Claimant was incapable of more than minimal standing or walking. (Id. at 10.) Third, and finally, the Commissioner asserts that the ALJ properly noted that Claimant's left knees problems progressively worsened, most likely due to Claimant's worsening hip pain. (Id.) Prior to July 17, 2005, Claimant reported only sporadic left knee problems and had normal station, gait, and power in his legs. (Id.) As of July 17, 2005, however, Claimant reported to Dr. Morgan several episodes of falling, which resulted in Dr. Morgan's opinion of no more than minimal standing or walking. (Id.) The Commissioner therefore asserts that "the ALJ properly selected July 17, 2005, because that was the date that Plaintiff's hip pain resulted in an inability to walk or stand, as confirmed by the MRI showing a complete tear of the anterior cruciate ligament." (Id.)

Social Security Ruling 83-20 defines the onset date of disability as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20 at 1. The Ruling goes on to state that in determining the onset date, relevant factors include "the individual's allegation, the work history, and the medical evidence," which factors often are evaluated together. Id. Regarding disabilities of nontraumatic origin, the "medical evidence serves as the primary element in the onset determination." Id. at 2. The claimant's alleged onset date should be used only if it is consistent with the available medical evidence. Id. "When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." Id. The claimant's alleged onset date or the date last worked "is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence." Id. at 1.

The Ruling further provides that when precise evidence is not available, the ALJ may need to consult a medical expert to establish the onset date. The Ruling states as follows in this regard:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83-20 at 3.

In Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995), the Fourth Circuit, citing SSR 83-20, found:

7

> The Ruling's language does not expressly mandate that the ALJ consult a medical advisor in every case where the onset of disability must be inferred. Nevertheless, if the evidence of onset is ambiguous, the ALJ must procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires. Spellman v. Shalala, 1 F.3d 357, 362-63 (5th Cir. 1993); Morgan v. Sullivan, 945 F.2d 1079, 1082-83 (9th Cir. 1991); *see* Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989); *but see* Pugh v. Bowen, 870 F.2d 1271, 1278 n.9 (7th Cir. 1989) (medical advisor was unnecessary where the ALJ had a complete medical chronology of the claimant's condition throughout the relevant time period).

In Bailey, the Court concluded that "[i]n the absence of clear evidence demonstrating the progression of [claimant's] condition, the ALJ did not have the discretion to forgo consultation with a medical advisor." Id. The Court stated that "[t]he requirement that, in all but the most plain cases, a medical advisor be consulted prior to inferring an onset date is merely a variation on the most pervasive theme in administrative law - that substantial evidence support an agency's decisions." Id. at 80 (citations omitted). The Commissioner asserts in the instant matter that a medical expert was not necessary "because many treatment notes in the record were dated prior to July 17, 2005." (Document No. 14 at 8, n. 1.)

In the instant case, Claimant alleged an onset date of January 1, 2004. (Tr. at 47.) The ALJ however, after considering all evidence of record, established the onset of disability as July 17, 2005, "the date claimant presented to the emergency room with increasing pain in the left hip and knee." (Tr. at 18.) Although the etiology of Claimant's complaints "was not determined at that time or at two subsequent emergency room visits, MRI of the left knee on August 19, 2005 showed complete tear of the anterior cruciate ligament." (Id.) The ALJ noted that on January 17, 2006, Dr. Morgan opined that Claimant was "incapable of more than minimal standing or walking." (Tr. at 18.) He further noted that Claimant's "condition progressed to the point that he eventually required total hip arthroplasty on April 19, 2006." (Id.) Accordingly, the ALJ determined that Claimant was unable to perform any gainful activity on a regular and continuing basis at any time since July 17,

2005. (Id.)

In finding Claimant not disabled from January 1, 2004, through July 16, 2005, the ALJ acknowledged Claimant's complaints of left hip and back pain, but determined that the record indicated that the pain was not as severe as he claimed. (Tr. at 18.) The ALJ explained his rationale as follows:

> Clinical findings at consultative examination by Dr. Rago in August 2004 were unremarkable apart from tenderness over the left hip and lumbosacral spine with some restriction of motion in those areas. Claimant sought emergency room treatment on January 30, 2005, but records show that gait and station were normal and claimant had presented only because hip pain had increased after he ran out of medication. Claimant failed to pursue recommendations made by Dr. Chand on February 22, 2005. Clinical findings at follow-up three months later were notable for normal gait, negative straight leg raising, and the absence of neurological deficits in the lower extremities, and the orthopedist indicated that discomfort was attributable to "early" osteoarthritic changes in the left hip and "mild" degenerative joint disease of the lumbar spine. After consideration of all evidence of record, and in the absence of a more restrictive assessment by a treating or examining physician, the undersigned accords great weight to the opinion of the reviewing physician at the reconsideration level (Exhibit B-11F) and concludes that, at all times from January 1, 2004 through July 16, 2005, claimant retained the residual functional capacity to occasionally lift and carry 10 pounds, sit for 6 hours, and stand/walk for 2 hours in an 8-hour period. . . . As further assessed by the reviewing physician at the reconsideration level, capacity for work at the sedentary level of exertion was reduced by inability to perform jobs that require climbing ladders, ropes, or scaffolds or involve concentrated exposure to fumes, odors, dust, gases, or hazards.

(Tr. at 18.)

The medical evidence prior to July 17, 2005, reveals that Claimant visited Welch Community Hospital on March 8, 2004, at which time he first complained of left hip pain since childhood, which had increased in severity the last four to six months.[1] (Tr. at 16, 116, 118.) Claimant reported that

---

[1] Medical evidence prior to Claimant's alleged onset date demonstrates that on October 15, 1983, Claimant was diagnosed at St. Luke's Hospital with an ACC tear of his left knee, following a motor vehicle accident. (Tr. at 213.) On August 30, 1992, Claimant visited Welch Community Hospital for complaints of his left knee giving out, as well as edema and pain. (Tr. at 149.) It was noted that Claimant previously had injured his knee and was being treated by Dr. Gajawaski for torn

the pain was increased with weight-bearing and prolonged standing or sitting. (Id.) Physical examination revealed good alignment of the spine and no tenderness to the lumbosacral area. (Tr. at 16, 116.) However, rotation of the left hip resulted in increased pain. (Id.) The x-rays of Claimant's pelvis and left hip of that date demonstrated chronic subluxation of the left hip with deformed head and acetabulum, as well as joint space narrowing and some lucencies within the head. (Tr. at 16, 117.) The right hip was normal. (Id.) The x-rays of Claimant's lumbosacral spine revealed no abnormalities of the bony and soft tissue structures. (Id.) The attending physician diagnosed left hip pain and degenerative joint disease, and prescribed Naprosyn, a nonsteroidal anti-inflammatory drug. (Tr. at 16, 116.) In a follow-up exam on March 23, 2004, Claimant complained of sharp left hip pain, which was increased on exertion. (Tr. at 16, 115.) Claimant rated the severity of the pain at a level nine out of ten. (Id.) Claimant also complained that his left knee was "popping in and out of place," as well as back pain. (Id.) Physical exam revealed decreased left hip motion and a mild limp. (Id.) However, Claimant had normal power in his lower extremities. (Id.)

Dr. Andres Rago, M.D., performed a consultative physical examination at the request of the state agency on August 26, 2004. (Tr. at 16, 168-77.) Claimant complained of neck, lower back, lower extremity, and left hip pain, without any specific history of injury. (Tr. at 16, 168-69.)

---

ligaments. (*Id.*) On October 14, 1994, CT scans of Claimant's cervical spine revealed an old fracture with sclerotic rim of the body of C5 and subluxation of C1 over C2. (Tr. at 143.) X-rays of Claimant's left knee on March 28, 1996, revealed very mild medial joint space narrowing. (Tr. at 138.)

On April 17, 2003, Claimant visited Welch Community Hospital for a routine visit and to check his blood pressure. (Tr. at 16, 122.) At that time, Claimant complained only of headaches, chest pain, and heartburn. (*Id.*) During a follow-up visit on April 23, 2003, Claimant had no complaints and was diagnosed with gastroesophageal reflux disease. (Tr. at 16, 120.) Claimant again visited Welch Community Hospital on August 4, 2003, for a physical to obtain a commercial driver's license. (Tr. at 16, 119.) The medical records indicate that Claimant's physical exam was unremarkable. (*Id.*)

Claimant reported a history of dislocation of the right hip, which recovered without any residual problem, and a history of left hip pain that occurred gradually while still in school and worsened over the years. (Tr. at 16, 169.) He noted that the left hip pain was aggravated by weightbearing, for which he used a cane, and certain motion of the left leg. (Id.) A review of systems revealed chronic joint pain of the knees, hip, neck, and low back. (Tr. at 16, 170.)

Physical examination revealed that Claimant ambulated with a cane and a slight limp that favored the left leg because of left hip pain. (Id.) Dr. Rago observed that Claimant was stable at station but noted that prolonged sitting aggravated low back pain, which radiated to the lower extremities, primarily the left leg. (Tr. at 16, 170-71.) Claimant hardly could walk on his heels or squat due to pain at the right knee and lower back, but could better walk on his toes. (Tr. at 16, 171.) Dr. Rago observed slight tenderness and slightly diminished range of motion of the neck, as well as slight tenderness at the left hip joint with a slight limitation of motion. (Id.) Claimant also exhibited slight tenderness across the lumbosacral area. (Id.) Nevertheless, Dr. Rago noted that there were no motor or sensory deficits and that all sensory modalities, including pinprick and light touch were well preserved. (Id.) He further noted that there was no muscle weakness or atrophy and that the x-ray of Claimant's right knee was unremarkable. (Tr. at 16, 172.) Dr. Rago opined that the chronic pain affecting Claimant's hip and knee joints could have been due to degenerative arthritis, and the pain at the neck and lower back could have been due either to degenerative arthritis or degenerative disc disease. (Id.)

On November 9, 2004, Marcia Brockwell, S.D.M., a state agency physician, completed a form Physical Residual Functional Capacity Assessment on which she opined that Claimant was limited to performing work at the light level of exertion. (Tr. at 178-85.) She opined that Claimant had occasional postural limitations, and should avoid concentrated exposure to vibration and

hazards. (Tr. at 180, 182.)

Claimant went to the emergency room at St. Luke's Hospital on December 31, 2004, for complaints of sharp pain in his left hip, which had persisted for the past ten years. (Tr. at 16, 206-07.) An x-ray revealed "chronic subluxation, presumably related to congenital hip dislocation." (Tr. at 16, 210, 212.) The x-rays also revealed associated osteoarthritis. (Tr. at 210, 212, 315.) Claimant's left hip pain was attributed to dysplasia, osteoarthritis, and the subluxation. (Tr. at 16, 204, 210, 212.) Dr. David K. Ofsa, D.O., wrote on his prescription pad that Claimant needed a left hip replacement. (Tr. at 16, 211.) Claimant returned to the emergency room on January 30, 2005, with complaints of left hip pain after he ran out of pain medication. (Tr. at 16, 201-02.) It was noted that Claimant used crutches most of the time, and presumably presented to the emergency room on crutches. (Tr. at 16, 202.) It further was noted however, that his gait and station were normal. (Tr. at 16, 203.)

Two weeks later, Claimant presented to the emergency room at Raleigh General Hospital on February 13, 2005, after he fell and experienced mild back and left hip pain. (Tr. at 16, 225.) The x-rays of Claimant's thoracic spine demonstrated vertebral body lipping, but no fracture. (Tr. at 232.) The x-ray of his pelvis and hips revealed "plain film sequela of left femoral head AVN and lateral subluxation." (Id.) The attending physician diagnosed dorsal sprain and prescribed a muscle relaxant and narcotic analgesic, Flexeril and Ultracet. (Tr. at 16, 226, 229.)

On February 22, 2005, Claimant saw Dr. Yogesh Chand, M.D., for an orthopedic evaluation. (Tr. at 16, 235-37.) Claimant reported pain in his left hip for quite some time, which progressively worsened the prior two to three years. (Tr. at 16, 235.) At times, Claimant experienced pain in his groin, greater trochanteric gluteal region, and his back. (Id.) Claimant rated his low back pain at a level nine out of ten in intesnity. (Id.) He noted that four months ago, Dr. Ofsa advised that he

12

needed a total knee arthroplasty.[2] (Id.) Claimant somehow lost track of time and ended up in the emergency room on February 13, 2005, with pain and no pain medication. (Id.) Examination revealed moderate tenderness over the L5-S1 and left sacroiliac joint, with normal range of lumbar motion, but with mild symptoms of pain. (Tr. at 236.) Straight leg raisin caused pain in the hip area and the left lef was atrophic with cavus deformities of both feet, which suggested clubbed feet deformities during childhood. (Id.) His feet however, were functional. (Id.)

Dr. Chand reviewed x-rays of Claimant's pelvis which revealed a congenital dislocation of the left hip with degenerative joint disease but well maintained joint space between the false acetabulum and the flattened femoral head. (Tr. at 236.) The x-rays of the lumbar spine demonstrated mild degenerative joint disease at the L5-sacral area. (Id.) Dr. Chand assessed degenerative joint disease of the lumbar spine with a possible disc herniation at the L5-sacral area and congenital dislocation of the left hip with degenerative and painful false joint. (Id.) Dr. Chand referred Claimant to West Virginia University for evaluation of his left hip for possible custom type total hip arthroplasty. (Id.) He refused to prescribe pain medication until Claimant passed a drug screen. (Id.)

On April 27, 2005, Dr. Uma P. Reddy, M.D., a state agency physician, completed a form Physical Residual Functional Capacity Assessment on which she opined that Claimant was capable of performing work at the medium exertional level. (Tr. at 246-53.) She opined that Claimant could be able to walk three to four hours in an eight-hour workday. (Tr. at 247.) She further assessed postural and environmental limitations, including never climbing ladders, ropes, or scaffolds and

---

[2] On December 31, 2004, Dr. Ofsa indicated that Claimant needed a left hip replacement. (Tr. at 211.) The Court presumes that Dr. Chand's medical notes mistakenly referred to a knee replacement rather than the hip placement. (Tr. at 235.)

occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. (Tr. at 248, 250.)

Claimant returned to Dr. Chand on May 23, 2005, with complaints of increased left hip and low back pain. (Tr. at 17, 361.) Claimant reported that the pain was worse when he stood on his left leg and when he walked. (Tr. at 361.) Dr. Chand noted that Claimant "did not follow through with any of the recommendations that I made with him." (Tr. at 17, 361.) However, Claimant's failure to follow through was attributed to an absence of medical insurance coverage to allow him to travel to West Virginia University for the recommended care. (Tr. at 361.) After reviewing his chart, Dr. Chand opined that Claimant's low back was "probably being irritated by the abnormal gait that he has." (Tr. at 361.) The x-rays however, showed only mild degenerative joint disease. (Id.)

On examination, straight leg raising was negative bilaterally, and neurologic functioning of his legs was normal. (Tr. at 361.) Contrary to his prior statement that Claimant had an abnormal gait, Dr. Chand noted on examination that Claimant's gait was normal. (Id.) Dr. Chand again assessed congenital dislocation of the left hip with degenerative joint disease and degenerative joint disease of the lumbar spine. (Id.) He advised that he would try to get Claimant to West Virginia University and temporarily provided pain medications. (Id.)

The medical evidence from July 17, 2005, reveals that Claimant presented to the emergency room at St. Luke's Hospital on July 17, 2005, after he fell and injured his left hip and left knee. (Tr. at 17, 301.) An x-ray of the left knee was unremarkable. (Tr. at 307.) The x-ray of the left hip demonstrated "congenital left hip dysplasia with mild superolateral subluxation of chronic nature . . . [with] underlying degenerative change." (Tr. at 307.) No acute fracture was detected. (Id.) The x-ray of Claimant's pelvis revealed "[c]ongenital left hip dysplasia with superolateral subluxation of left femoral head. . . [with] [n]o evidence of acute bony trauma detected to pelvis or hip joint."

14

(Id.) The attending physician assessed a left hip strain and prescribed Ultram and Robaxin. (Tr. at 306.)

One month later, on August 11, 2005, Claimant returned to the emergency room at St. Luke's Hospital, on crutches, with complaints of left knee pain with radiation to the left hip. (Tr. at 17, 291-96.) Claimant described the left hip pain as sharp in nature and constant. (Tr. at 291.) He rated the pain at a level eight out of ten. (Id.) Claimant reported that his left knee had gone in and out all his life but for the past month, the going out occurred all the time. (Id.) An x-ray of the left knee revealed no fracture, and an MRI was suggested. (Tr. at 297.) An MRI scan of the left knee on August 19, 2005, demonstrated a complete tear of the anterior cruciate ligament with joint effusion and arthritis in the tibiofibular joint. (Tr. at 17, 351.)

On November 1, 2005, Claimant was referred by Dr. Chand to Dr. Eddie Powell, M.D., and Dr. George Raukar, M.D., at West Virginia University's Department of Orthopaedics. (Tr. at 359-60.) Dr. Raukar noted at least a three year history of developmental dysplasis of his left hip and opined that Claimant "more than likely has been like this all his life, however, it was not discovered until he was in a car accident approximately three years ago." (Tr. at 359.) Drs. Raukar and Powell reviewed x-rays taken on October 30, 2005, which revealed a subluxed hip with "some pretty good coverage" of the femoral head and "minimal signs of arthritis."[3] (Tr. at 360.) They recommended a hip injection and follow-up with a rheumatologist for work-up of his congenital joint laxity. (Id.)

---

[3] The x-rays of Claimant's pelvis taken on October 30, 2005, demonstrated "superolateral displacement of the head of the left femur with sclerosis in the left hip and compatible with chronic left hip dislocation. Mild to moderate degenerative arthritis in the right hip." (Tr. at 349.) The impression was "[c]hronic dislocation of the left hip and degenerative arthritis of the right hip." (*Id.*) Separate x-rays of the right hip demonstrated "mild narrowing of the right hip joint space and spur formation." (Tr. at 350.) Impression was "[m]ild to moderate degenerative arthritis in the right hip." (*Id.*)

From October 20, 2005, to March 13, 2006, Claimant sought treatment from Dr. David L. Morgan, D.O., a pain specialist. (Tr. at 17, 318-22, 366-71.) During this period, Claimant reported that he fell on at least three occasions due to hip pain and Dr. Morgan's examination of Claimant's hip was positive. (Tr. at 319, 321, 367.) On January 17, 2006, Dr. Morgan opined that Claimant was unable to "do any activities requiring him to lift, carry, stand or walk, pushing/pulling." (Tr. at 17, 323.) He further opined that Claimant could not "climb, balance, stoop, kneel, crouch or crawl for sustained periods secondary to chronic Subluxation of left hip and Degenerative Disc Disease in the Lumbar area." (Id.) On March 13, 2006, Dr. Morgan referred Claimant to an orthopedist. (Tr. at 367.)

On March 15, 2006, an x-ray of Claimant's left hip revealed "[s]evere deformity of the left femoral head and acetabulum on the left side." (Tr. at 364.) On March 27, 2006, Claimant was examined by Dr. Khaled J. Saleh, M.D., an orthopedic surgeon. (Tr. at 17, 372-78.) Dr. Saleh noted that x-rays taken that day revealed "developmental dysplasia of the hip and subsequent development of osteoarthritis." (Tr. at 372, 374-77.) He noted that Claimant virtually had "no acetabulum and a subluxated hip." (Id.) Also, there was a "collapse of the femoral head and subchondral sclerosis consistent with degenerative joint disease." (Id.) On examination, Dr. Saleh observed that Claimant's left leg was painful at extreme ranges of motion, though he was able to flex to 90 degrees with about 20 degrss of internal/external rotation. (Id.) He noted that "[d]istally, [Claimant] is neurovascularly intact." (Id.) Dr. Saleh explained treatment options to include "fusion, conservative treatment, [or] total hip arthroplasty." (Tr. at 17, 372.) Claimant "agreed that total hip arthroplasty was the best treatment for his particular problem." (Id.) Dr. Saleh performed the left total hip arthroplasty on April 19, 2006. (Tr. at 17, 383-89.) Claimant was discharged on April 22, 2006, with instructions that he could resume activity "as tolerated with hip precaution and an abduction brace."

16

(Tr. at 384.) He also was instructed to undergo physical therapy and was prescribed pain medication, Percocet. (Id.)

Based on the foregoing medical evidence, the Court finds that the ALJ's attempt to determine the date on which Claimant's hip and leg pain deteriorated to the point of disability involved nothing more than guesswork on the part of the ALJ. It is clear that Claimant suffered from a chronic or developmental dysplasia of the left hip, for at least three years from November 1, 2005, and most likely since childhood. (Tr. at 116, 118, 359.) The medical evidence reflected an x-ray diagnosis of chronic subluxation of the left hip with a deformed head and acetabulum, with some transparent areas within the head and degenerative joint disease, as early as May 8, 2004. (Tr. at 117.) The x-ray diagnosis on July 17, 2005, likewise was "congenital left hip dysplasia with mild superolateral subluxation of chronic nature . . . [with] underlying degenerative change. (Tr. at 307.) The ALJ determined that on July 17, 2005, Claimant presented to the emergency room with complaints of "increasing pain in the left hip and knee." (Tr. at 18.) The medical records however, reflect Claimant's complaints of left knee and left hip pain after falling on his left hip, which had a "deteriorating socket." (Tr. at 301.) Claimant consistently complained of sharp left hip pain, which was increased on exertion both before and after July 17, 2005. (Tr. at 115-16.) Similarly, Claimant complained of his left knee "popping in and out" as early as March 23, 2004. (Tr. at 115.) Admittedly, the pain was exacerbated when he fell on July 17, 2005. Furthermore, the ALJ found that Claimant's "condition progressed to the point that he eventually required total hip arthroplasty on April 19, 2006. (Tr. at 18.) However, a hip replacement was recommended as early as December 31, 2004. (Tr. at 211.)

In finding that Claimant was not disabled prior to July 17, 2005, the Claimant relied in part on Dr. Rago's unremarkable examination findings and notations of only some tenderness and

17

restriction of motion. (Tr. at 18, 171-72.) Though Dr. Rago's findings may have been slight according to the ALJ, the findings of Dr. Saleh on March 27, 2006, which was less than one month before Claimant's left total hip arthroplasty, Claimant exhibited only slight restrictions of left leg motion and experienced pain only at the extreme ranges of motion. (Tr. at 372, 374-77.) Dr. Saleh even assessed that "[d]istally, [Claimant was] neurovascularly intact." (Id.)

The ALJ also noted that on January 30, 2005, it was noted that Claimant presented to the emergency room with normal gait and station. (Tr. at 18, 201-02.) The medical records however, reflect conflicting statements in that Claimant presented to the emergency room on crutches, which he used most of the time, but that his gait and station were normal. (Tr. at 202-03.) The medical evidence reveals that Claimant complained of increased left hip pain with weightbearing on March 8, 2004; walked with a mild limp on March 23, 2004; ambulated with a cane and a slight limp on August 26, 2004, when examined by Dr. Rago, and could hardly walk on his heels or squat; and exhibited an abnormal gait on May 23, 2005, when examined by Dr. Chand. (Tr. at 115-16, 118, 169-71, 361.)

In finding no disability prior to July 17, 2005, the ALJ further noted that Claimant failed to pursue any of the recommendations made by Dr. Chand on February 22, 2005. (Tr. at 18.) Dr. Chand recommended that Claimant be evaluated at WVU for evaluation of his left hip for possible custom type total hip arthroplasty, and indicated that he would prescribe pain medication after Claimant passed a drug screen. (Tr. at 236.) The medical records make no reference to a subsequent drug screen, but do indicate on May 23, 2005, in a follow-up note by Dr. Chand that Claimant was unable to follow through on the recommendations because Claimant did not have medical coverage to allow him to travel to WVU for the recommended care. (Tr. at 361.) Dr. Chand noted that Claimant was "unable to go to any other medical doctor presently, since he has no coverage." (Id.) Though there

is no indication that Claimant sought, but was refused the recommended medical treatment due to a lack of financial means, it appears that in the absence of further inquiry, the ALJ improperly failed to acknowledge Claimant's lack of funds as an excuse for not following Dr. Chand's recommendations. Notwithstanding the failure to follow the recommendations, the ALJ also noted that on May 23, 2005, Claimant presented with a normal gait and neurological examination, had negative straight leg raising, and was diagnosed with only early osteoarthritis and mild degenerative joint disease. (Tr. at 18.) Dr. Chand's notes from May 23, 2005, reflect conflicting statements as to the status of Claimant's gait. (Tr. at 361.) Nevertheless, as discussed above, Claimant was found to have an abnormal gait or mild limp on other occasions prior to July 17, 2005.

Finally, in finding that Claimant was able to perform sedentary work prior to July 17, 2005, the ALJ relied upon the assessment of Dr. Reddy that Claimant was capable of performing medium exertional level work as of April 27, 2005. (Tr. at 18.) While the ALJ was entitled to rely on the opinion of the state agency physician, such opinion was not based on the entirety of the medical evidence prior to the date rendered or the evidence after the opinion but before the ALJ's assessed onset date. The only medical evidence cited in Dr. Reddy's assessment was the September 8, 2004, report of Dr. Rago's August 26, 2004, consultative examination, as well as x-rays of Claimant's lumbar spine on February 22, 2005, and Dr. Chand's orthopedic note of the same date. (Tr. at 253.) There is no indication that Dr. Reddy reviewed or considered the emergency room notes and x-rays of March 8, 2004, March 23, 2004, December 31, 2004, or February 13, 2005. Likewise, Dr. Reddy did not consider Dr. Chand's May 23, 2005, follow-up note.

Accordingly, the Court finds that the medical evidence demonstrates a persistent left hip condition over a period of at least a few years. Though Claimant's left knee condition was exacerbated on July 17, 2005, when he fell, the evidence reflects problems with his knee prior

19

thereto. However, there were no radiology reports regarding his left knee since at least January 1, 2004, the alleged onset date, though in 1983 he experienced a similar tear of the knee, which apparently healed. The Commissioner correctly pointed out that the medical evidence consisted of several medical notes prior to July 17, 2005. However, much of the evidence was consistent before and after July 17, 2005. The ALJ chose an onset date based on the occurrence of a fall, which prompted radiological images of the left knee. Given Claimant's complaints regarding his left knee, as well as his chronic left hip condition, the ALJ's decision to award benefits as of July 17, 2005, without the opinion of a medical advisor, was arbitrary. See Bailey, 68 F.3d at 80 ("In cases such as this one, medical advisors are the prescribed mechanism for reaching the required evidentiary threshold; their services may not be dispensed with by fiat.").

Accordingly, for the reasons set forth in this Memorandum Opinion and by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment (Document No. 12.) is **GRANTED**, the Defendant's Motion for Judgment on the Pleadings (Document No. 14.) is **DENIED**, the final decision of the Commissioner is **VACATED**, and this matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

ENTER: March 31, 2009.

R. Clarke VanDervort
United States Magistrate Judge